UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARIA SANTILLAN, et al., on behalf of
themselves and others similarly situated,

               Plaintiffs,

v.

ALBERTO R. GONZALES, Attorney General of
the United States; MICHAEL CHERTOFF,
Secretary of the Department of Homeland Security;
THE UNITED STATES CITIZENSHIP AND
IMMIGRATION     SERVICES     (USCIS);
EDUARDO AGUIRRE, JR., USCIS Director;
DAVID STILL, USCIS San Francisco District
Director,

               Defendants.

_____/

No. C 04-2686 MHP

**ORDER**

      Plaintiffs Maria Santillan, et al. represent a class of persons who have been or will be granted lawful permanent resident status by the Justice Department's Executive Office of Immigration Review and to whom the United States Citizenship and Immigration Services has failed to issue evidence of status as a lawful permanent resident.  Since certification of the present class, defendants have changed relevant Executive Office of Immigration Review regulations.  Arguing that the new regulations render the action no longer justiciable, defendants herein move to dismiss claims by future class members with prejudice, dismiss existing class members' claims without prejudice, and/or decertify the class.  Having considered the arguments of the parties, and for the reasons set forth below, the court issues the following order.

BACKGROUND

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

Named plaintiffs Maria Santillan, et al., were granted the status of lawful permanent resident ("LPR") by Immigration Judges or by the Board of Immigration Appeals, constituent courts of the Justice Department's Executive Office of Immigration Review ("EOIR").[1]  Following the EOIR's determination, plaintiffs sought documentation of their adjusted status as LPRs from their local United States Citizenship and Immigration Services ("USCIS") sub-office, through a process called Alien Documentation, Identification and Telecommunication ("ADIT") processing.[2]  Under policies commenced in the aftermath of September 11, 2001, all applicants for documentation of adjusted status have been required to undergo background and security checks involving multiple federal agencies.  See Aug. 9, 2004 Sposato Dec. ¶¶ 1-9.  Until those checks are completed, the USCIS has not been permitted to issue any immigration benefit to plaintiffs, such as adjustment of status to lawful permanent residency or the issuance of temporary documentation verifying LPR status.  See id. ¶¶ 11-12.

Plaintiffs allege that under these procedures, persons granted LPR status waited from several months to over one year for the commencement of their ADIT processing, in addition to weeks or months for the completion of processing and the issuance of documentation verifying LPR status.  See Pls' Exhs. A-J.  They allege that during the post-adjudication, pre-documentation period, many immigrants lost work and travel authorization due to the expiration of their former immigration status, the refusal of agencies to renew work authorizations due to the immigrants' adjustment to LPR status, and lack of documentation of their new LPR status.  On July 4, 2004, plaintiffs filed an action for declaratory and injunctive relief, seeking to compel defendant officials to issue LPRs evidence of their adjusted legal status "in a timely manner."

On October 12, 2004, this court certified plaintiffs' claims as a class action.  See Santillan v. Ashcroft, 2004 WL 2297990 (Oct. 12, 2004 N.D. Cal.) (Patel, J.).  The class was defined as follows:

> The class consists of all persons who were or will be granted lawful permanent resident status by the EOIR, through the Immigration Courts or the Board of Immigration Appeals of the United States, and to whom USCIS has failed to issue evidence of registration as a lawful permanent resident, with the exception that the class excludes the 34 named plaintiffs in Lopez-Amor v. U.S. Attorney General, No. 04-CV-21685 (S.D. Fla.) and the plaintiff class in Padilla v. Ridge, No. M 03-126 (S.D. Tex.).[3]

In the class certification order, this court considered defendants' standing, mootness, and ripeness challenges to plaintiffs' claims.  Santillan v. Ashcroft, 2004 WL 2297990 (Oct. 12, 2004 N.D. Cal.) (Patel, J.).  Many of the named plaintiffs had received documentation of their status within weeks of filing their

2

complaint (after waiting months or years prior), and these persons' claims were deemed moot.  However, this court held that the remaining named plaintiffs' claims were justiciable, and the order noted that the mooting of named plaintiffs' individual claims after class certification would not moot the class action as a whole.  Plaintiffs subsequently amended their complaint to add new named plaintiffs who had suffered long delays in documentation of adjusted status.

On April 1, 2005, a new system of EOIR regulations went into effect which reorganized the procedures governing security and law enforcement investigations of putative class members in several ways.  Most significantly, the new regulations repositioned the timing of security examinations of applicants, requiring those examinations to be completed *before* an alien's *application* for adjustment of status can be heard by an immigration judge, rather than *after* a *grant* of adjusted status.  See generally 8 C.F.R. § 1003.47.

Specifically, the new regulations change the timing, notice, and allocation of responsibility for security checks.  At the front end, any hearing at which an alien files or expresses intent to file an application for relief that is subject to background checks, the "DHS shall notify the respondent of the need to provide biometrics and other biographical information and shall provide a biometrics notice and instructions to the respondent for such procedures."  8 C.F.R. § 1003.47(d).  Immigration judges are instructed to account for security processing in scheduling hearings, and security checks must be conducted "as promptly as is practicable (considering, among other things, increased demands placed upon such investigations)."  Id. § 1003.47(e).  Where investigations are incomplete by the time of the hearing, the immigration judge may grant a continuance or hear the case on the merits, however, the judge may not grant an application for immigration relief if the examinations are incomplete or not current.  Id. § 1003.47(f)-(g).  See also 8 C.F.R. § 1003.1 (instructing that the Board of Immigration Appeals shall not issue a decision affirming or granting an alien an immigration status, benefit, or relief that requires completion of security investigations if such investigations have not been completed during the proceedings, the results of prior investigations are no longer current, or investigations have uncovered any information bearing on the merits of the alien's application).  Where an investigation is complete and an immigration judge has granted LPR status, the "decision granting such relief shall include advice that the respondent will need to contact an appropriate

3

1   office of DHS."  8 C.F.R. § 1003.47(i).  The new regulatory scheme affects only EOIR processes, with no

2   instructions or guidelines for USCIS issuance of documentation.

3       Defendants argue that the new regulations render the claims of any class members granted LPR

4   status after April 1, 2005 moot or otherwise non-justiciable.  For those class members deemed LPRs prior

5   to that date, defendants argue that their claims should be dismissed without prejudice on the basis of non-

6   justiciability, or that the class should be decertified for lack of numerosity and commonality.

7

8   LEGAL STANDARD

9   I.      Mootness

10      The jurisdiction of federal courts depends on the existence of a "case or controversy" under

11  Article III of the Constitution.  PUC v. FERC, 100 F.3d 1451, 1458 (9th Cir. 1996).  "A claim is moot if it

12  has lost its character as a present, live controversy."  American Rivers v. National Marine Fisheries

13  Service, 126 F.3d 1118, 1123 (9th Cir. 1997) (citing American Tunaboat Ass'n v. Brown, 67 F.3d 1404,

14  1407 (9th Cir. 1995)).  "In the context of declaratory and injunctive relief, [a plaintiff] must demonstrate

15  that she has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient

16  likelihood that she will again be wronged in a similar way."  Bird v. Lewis & Clark College, 303 F.3d

17  1015, 1019 (9th Cir. 2002) (internal quotation marks and citation omitted), cert. denied, 538 U.S. 923.

18  Where the activities sought to be enjoined have already occurred and the courts "cannot undo what has

19  already been done, the action is moot."  Friends of the Earth, Inc. v. Bergland, 576 F.2d 1377, 1379 (9th

20  Cir. 1978).  "The burden of demonstrating mootness is a heavy one."  Northwest Environmental Defense

21  Center v. Gordon, 849 F.2d 1241, 1243 (9th Cir. 1988).

22      A defendant's voluntary cessation of a challenged practice does not render a case moot unless

23  the party asserting mootness meets the "heavy burden" of showing that it is "absolutely clear the allegedly

24  wrongful behavior could not reasonably be expected to recur."  See Students for a Conservative America

25  v. Greenwood, 378 F.3d 1129, 1131 (9th Cir. 2004) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl.

26  Servs., Inc., 528 U.S. 167, 189 (2000)).  The standard for assessing voluntary cessation is "stringent."

27  Laidlaw, 528 U.S. at 189.

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

4

**II.     Standing**

Under Article III, federal courts cannot entertain a litigant's claims unless that party demonstrates concrete injury, satisfying the burden to demonstrate both constitutional and prudential standing to sue. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  To meet constitutional requirements, a plaintiff must show that (1) he has suffered an "injury in fact" which is "concrete and particularized" and "actual or imminent"; (2) the injury is fairly traceable to the challenged actions of the defendant; and, (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." Id. at 560-61 (internal quotations and citations omitted).  Prudential requirements for standing include: (1) whether plaintiff's alleged injury falls within the "zone of interests" protected by the statute or constitutional provision at issue, (2) whether the complaint amounts to generalized grievances that are more appropriately resolved by the legislative and executive branches, and (3) whether the plaintiff is asserting his or her own legal rights and interests, rather than those of third parties.  See Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1179 (9th Cir. 2000); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 (1979); Powers v. Ohio, 499 U.S. 400, 410 (1991).

**III.     Ripeness**

"Ripeness doctrine protects against premature adjudication of suits in which declaratory relief is sought," Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1044 (9th Cir. 1999) (en banc), in order to prevent "entanglement in theoretical or abstract disagreements that do not yet have a concrete impact on the parties." 18 Unnamed "John Smith" Prisoners v. Meese, 871 F.2d 881, 883 (9th Cir. 1989).  The ripeness inquiry contains both a constitutional and a prudential component.  Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).

**DISCUSSION**

In their present motion, defendants repeat their mootness, standing, and ripeness challenges in the context of the DHS regulatory change, moving for dismissal of the claims of all LPRs granted status by the EOIR on or after April 1, 2005.  As for the remaining members of the class granted status before the enactment of the new regulations, including named plaintiffs, defendants argue that their claims should be

**UNITED STATES DISTRICT COURT**
For the Northern District of California

5

1   dismissed without prejudice as moot, or in the alternative, the class should be decertified due to the

2   disintegration of commonality and numerosity.

3

4   I.       Justiciability of Post-April 1, 2005 Class Member Claims

5           According to defendants, the new procedures mandating completion of security screening checks

6   prior to the issuance of documents verifying LPR status moot the heart of plaintiffs' allegations and class

7   cohesion and negate the standing of any class members granted LPR status after April 1, 2005.  They argue

8   that the new regulations are untested, making it mere speculation to assume future delays in the issuance of

9   documentation and rendering this case unripe for any adjudication of plaintiffs' causes of action.  Plaintiffs

10  argue that the change does not affect the present class action, because the complaint addresses the purely

11  legal question of defendants' ministerial duty to issue documentation of LPR status.  In addition, plaintiffs

12  argue that the new policies give no basis for confidence that the delays at issue in the litigation will cease.

13          A.       Mootness

14          Under the new regulations, defendants estimate that the time period between the grant of status

15  and the issuance of a Permanent Resident Card (I-551) should be quite brief, simply long enough for

16  "physical processing" of the card.  With this change, defendants believe they have resolved the concerns at

17  the heart of class certification and mooted the claims of any persons granted LPR status after April 1, 2005.

18  Defendants' unilateral changes to EOIR policy trigger the application of voluntary cessation doctrine, which

19  requires this court to evaluate the wrongs alleged in the current class action, the nature and scope of the

20  policy change, and whether defendants have met their heavy burden to show that delays will not continue

21  under the new policy.

22          1.       The Wrongs Alleged by Named Plaintiffs

23          The parties dispute the nature of the wrongs at the heart of plaintiffs' action.  Defendants argue

24  that the new EOIR policies address post-adjudication delays caused by security checks and therefore

25  represent a complete cessation of the aggrieved conduct.  Arguing for a less restrictive vision of the scope

26  and purpose of this lawsuit, plaintiffs invoke their own USCIS case histories and the testimony of

27  government officials to demonstrate that factors unrelated to security clearances contributed to long delays

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

6

UNITED STATES DISTRICT COURT
For the Northern District of California

1    in the issuance of documentation at USCIS.

2         As a threshold matter, the court disagrees with defendants that the timing and procedures for

3    security background checks are the only questions binding the class and driving this litigation.  Security

4    procedures are nowhere to be found in the class definition.  The linchpin of the class definition is the *fact* of

5    the failure to issue evidence of LPR status, not the precise *causes* of that failure.  This court deemed

6    plaintiffs' complaint justiciable and certified the class on the basis of the shared injury of delays in

7    documentation and the shared question of defendants' ministerial duty.

8         Thus situated, the primary question before the court is whether changes to the timing of security

9    clearances will affect many of the problems specifically identified in plaintiffs' allegations and the

10   submissions in the record.  The case histories of several original or amended named plaintiffs indicate that

11   factors other than the time needed for security checks contributed to delays in issuance of documentation

12   before April 1, 2005.  For example, Ziber Ismaili's favorable FBI disposition occurred in October of 2003,

13   but his documentation did not issue until eleven months later, in August of 2004.[4]  Rhyu Dec., Exh. 10 at

14   003203.  Named plaintiffs Angela DeSousa, Jose Luis Miranda, Miroslava Hernandez, and Pablo

15   Hernandez Cavillo, were cleared by background checks one to six months *before* they were adjudicated

16   LPRs (i.e., in the same sequence as under the new system), but total delays between the grant of LPR

17   status and issuance of documentation were 11 months in DeSousa's case, and at least 22 months in the

18   other three plaintiffs' cases.[5]  Id. at 000317, 001476, 001669, 001673, 006108-9.

19        Poor internal communication within the complex DHS bureaucracy also appears in named

20   plaintiffs' records.  Janis Sposato, USCIS Deputy Associate Director of Operations, acknowledged that

21   the case files of Jose Luis Miranda, Ziber Ismaili, Zoila Lopez-Gonzalez, and Maria Valda Mohamad

22   "reflect that they or their representatives contacted USCIS about receiving documentation prior to the filing

23   of this lawsuit and after EOIR issued the orders resulting in their LPR status."  May 23, 2005 Sposato

24   Second Supp. Dec. ¶ 17.  Such efforts were not reflected in the files of other named plaintiffs, but the

25   record leaves the court with little confidence about the completeness of those files.  See id. ¶ 15.  Counsel

26   for named plaintiff Marcos Jose Sosa Cartegena, among those identified by defendants as having never

27   contacted the USCIS, submitted three requests addressed to USCIS for LPR documentation, none of

28

7

1   which were apparently retained in his USCIS file.  Compare id. ¶ 15 with Rhyu Dec., Exh. 14.  Cartegena

2   waited more than a year for his LPR documentation, and, as in the case of all other named plaintiffs, he was

3   not issued documentation of his status until shortly following the filing of this lawsuit.

4          Depositions of government officials in the case reveal that the time needed for the security check

5   was not the only, or even the principal, cause of delay in the pre-April 1, 2005 process.  Sposato testified

6   that "the first and maybe longest delay" was between the grant of the immigration benefit and USCIS notice

7   of the grant.  May 4, 2005 Sposato Dep. at 55:7-10.  Additional delays were caused by actually

8   conducting the security checks, verifying that the grant had actually been made and not appealed, and delay

9   related to taking biometric data and actually issuing permanent documents.  Id. at 55:18-56:1.  Sposato

10  testified she "wouldn't be surprised" if files were lost, misplaced, or sent to the wrong location.  Id. at 59:9-

11  60:2.  "Many times" requests for documentation were dispatched to the wrong location, and evidence in the

12  record states that "in some cases" these errors took several years to identify and correct.[6]   Rhyu Dec.,

13  Exh. 15 at 011318.

14          In this court's prior order, plaintiffs' case was deemed justiciable and their class certified pursuant

15  to Rule 23 on the basis of delays in documentation, regardless of the cause.  However, the record indicated

16  that the delays were primarily caused by three problems commonly faced by class members: unclear duties

17  and bureaucratic confusion in the commencement of security checks, long delays pending security clearance

18  itself, and bureaucratic delay or communication gaps in triggering production of documents following a

19  completed security check.  The question thus remains whether and to what extent such problems have been

20  addressed by the new framework.

21          2.     The Likelihood of Recurrence Under the New Regulatory Framework

22          As a general rule, "a defendant's voluntary cessation of a challenged practice does not deprive a

23  federal court of its power to determine the legality of the practice."  See Laidlaw, 528 U.S. at 189.

24  However, "[a] case might become moot if subsequent events made it absolutely clear that the allegedly

25  wrongful behavior could not reasonably be expected to recur."  Id.  Defendants bear the "heavy burden" of

26  meeting this standard.  Id.  The crux of plaintiffs' opposition to the current motion to dismiss is that

27  defendants have not satisfied their burden, because nothing in the regulatory change actually ensures that

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

8

1  plaintiffs will receive documentation of their status within a reasonable amount of time.

2        Defendants argue that this court should adopt the rebuttable presumption applied in some circuits

3  that voluntary cessation of challenged behavior will not relapse where the defendant is a government actor.

4  See Troiano v. Supervisor of Elections in Palm Beach, 382 F.3d 1276, 1283 (11th Cir. 2004); Fed'n of

5  Adver. Indus. Representatives v. City of Chicago, 326 F.3d 924, 929 (7th Cir. 2003).  This rule is justified

6  by government regularity and comity.  See Troiano, 82 F.3d at 1283 (justifying the rebuttable presumption

7  in terms of the solicitude and leeway due to other government actors);  Fed'n of Adver. Indus.

8  Representatives, 326 F.3d at 929 (holding that where defendants are public officials, their acts of self-

9  correction deserve greater stock if they appear genuine).  See also United States Postal Serv. v. Gregory,

10  534 U.S. 1, 10 (2001) (holding, outside the context of justiciability, that "a presumption of regularity

11  attaches to the actions of Government agencies").

12        Ample case law, including some of the cases applying a rebuttable presumption in voluntary

13  cessation cases involving government actors, holds that the repeal of a specific law challenged by a plaintiff

14  moots a case.  See, e.g., Fed'n of Adver. Indus., 326 F.3d at 930; Native Village of Noatak v. Blatchford,

15  38 F.3d 1505, 1510 (9th Cir. 1994).  As one court aptly put it, "declaratory judgment on the validity of a

16  repealed [statute] is a textbook example of advising what the law would be upon a hypothetical state of

17  facts."  Citizens for Responsible Gov't v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000) (quotations

18  and citations omitted).  In such cases, the likelihood that the government will drop the new policy and revert

19  to its older regulations is remote, at best.  Complete and tangible satisfaction of the relief sought by a

20  plaintiff provides a similarly firm basis for deeming a case moot.  For example, Troirano involved the

21  "undisputed" satisfaction of the relief sought by plaintiffs in advance of an injunctive order, leaving no basis

22  for the court to reasonably expect the alleged injuries to recur.  See 382 F.3d at 1283 (finding the case

23  moot where all precincts targeted for the installation of certain voting equipment had received that

24  equipment during the litigation).

25        By contrast, the present action does not concern the repeal of a challenged policy or the certain

26  fulfillment of plaintiffs' requested relief.  As discussed in greater detail below, the case involves changes in

27  policy which affect one significant cause of plaintiffs' alleged injury.  The specific relief requested in the

28

UNITED STATES DISTRICT COURT
For the Northern District of California

9

UNITED STATES DISTRICT COURT
For the Northern District of California

1   amended complaint remains available and unaffected by the change in policy, including: (1) declaratory

2   relief regarding the constitutionality of defendants' policies and practices under the Fifth Amendment due

3   process clause, (2) an injunction to prevent defendants from withholding documentation from class

4   members based on defendants' assessment of background check results, and (3) an injunction ordering

5   defendants to issue class members evidence of LPR status no more than 14 days after the final grant of

6   LPR status.  Pls' Opp'n at 14.  Such relief has not been provided and remains a viable option for resolution

7   of class claims.

8           Furthermore, even if the rebuttable presumption would be appropriate in this case under the law

9   of the Eleventh or Seventh Circuits, application herein would need to account for two Ninth Circuit

10  principles binding this court.  First of all, Ninth Circuit precedent has rejected findings of mootness in cases

11  involving the voluntary cessation of challenged conduct by government actors where "[d]efendants have

12  neither asserted nor demonstrated that they will never resume [the challenged conduct] nor have they

13  offered any reason why they might not return in the future to their original views on the utility of [the

14  challenged conduct]").  See Norman-Bloodsaw v. Lawrence Berkeley Lab., 135 F.3d 1260, 1274 (9th

15  Cir. 1998) (holding that a voluntary change in policy by a public actor did not moot the plaintiffs' claims);

16  Olagues v. Russoniello, 770 F.2d 791, 794-95 (9th Cir. 1985) (holding the United States Attorney to a

17  "heavy burden" of showing that the challenged conduct had been "completely and irrevocably eradicated"

18  and could not recur).  This reasoning echoes the Supreme Court's clear rule that defendants bear a heavy

19  burden in asserting voluntary cessation and implicitly holds public actors to the same standard.  See

20  Laidlaw, 528 U.S. at 189.

21          Secondly, the Ninth Circuit has held that mootness doctrine in general and the voluntary cessation

22  exception in particular is underscored by the principle that "[o]nce a defendant has engaged in conduct the

23  plaintiff contends is unlawful and the courts have devoted resources to determining the dispute, there is

24  Article III jurisdiction to decide the case as long as the parties do not plainly lack a continuing interest. . ."

25  See Demery v. Arpaio, 378 F.3d 1020, 1026 (9th Cir. 2004).  Therefore, while this court acknowledges

26  the persuasive authority cited by defendants that this court should never assume that agency policies will

27  vacillate according to the whims of litigation, mootness analysis in this circuit must ultimately turn on the

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    defendants' showing in the present action and the parties' continuing interest in the case.

2           Several factors influence the likelihood of recurrence in this case.  First of all, the record before

3    the court indicates that significant causes for delay may have been addressed by features of the new

4    regulations.  The new framework (1) creates notice requirements and mechanisms by which an immigrant

5    learns of the next steps for obtaining documentation, (2) delineates responsibility for initiating processing of

6    documentation to the immigrant, and (3) organizes the scheduling of immigration relief hearings around the

7    time necessary to process security clearances.  See 8 C.F.R. § 1003.47(d)-(i).  These changes address the

8    most glaring communication gaps, and they relocate the time needed for security checks to a pre-

9    adjudication period unreached by the present class action.

10          The gravamen of this action is the unjustified and injurious delay in issuing documentation of LPR

11   status.  The relief sought is the eradication of that delay.  It is defendant's heavy burden to show, with

12   absolute clarity, the eradication of the delays challenged in the case.  Defendants have not carried this

13   burden.  Nothing in the new regulations targets the USCIS, the actor ultimately responsible for issuing LPR

14   documentation, and nothing in the regulations creates accountability in interagency communication.  See

15   generally 70 Fed. Reg. 4743; 8 C.F.R. § 1003; 8 C.F.R. § 1208.  In fact, the regulations do not address

16   any objectives or procedures for documentation of LPR status, because they do not concern the events

17   after EOIR adjudication.  Id.  Though delays are at the heart of plaintiffs' complaint, the regulations do not

18   provide any accountability—or even any commitment—to a certain time frame for processing.  Id.  In the

19   absence of corresponding regulatory commitment, testimony from individuals that improvements will ensue

20   are insufficient to meet a defendants' burden to "assert[] or demonstrate[] that they will never resume the

21   challenged conduct" of substantial delays in formal documentation of defensive adjustments of status.  See

22   Norman-Bloodsaw v. Lawrence Berkeley Lab., 135 F.3d 1260, 1274 (9th Cir. 1998) (finding a case was

23   not moot where defendants did not assert that any "interim relief or events have completely and irrevocably

24   eradicated the effects of the alleged violation").

25          In addition to the fact that the record before the court lacks a regulatory commitment to

26   reasonably efficient documentation of status, specific features of the new system make it vulnerable to new

27   sources of delay.[7]  For instance, under the new system, Immigration Customs Enforcement ("ICE") must

28

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1   submit a document to USCIS verifying the grant of LPR status, the completion of security checks, and the

2   absence of a pending appeal.  May 4, 2005 Sposato Dep. at 37:6-18.  Sposato testified that there is no

3   nationwide system in place for the transfers from ICE to USCIS, and that individual offices may adopt

4   methods ranging from faxing them, walking papers from office to office, or possibly transmitting them via

5   email.  Id. at 69:13-19.   Local offices of ICE and USCIS "have been instructed to develop reliable

6   methods of rapid transmission," but there is no time frame required.  May 23, 2005 Second Supp. Sposato

7   Dec. ¶ 6.  The record in this case gives little confidence that merely transferring these documents will make

8   the system more efficient than the file-sharing practice in place under the former system.  If past history is

9   any indication, bureaucratic inertia and bungling will not make the new regulations any more efficient.  There

10  are new opportunities in these regulations for communication gaps and delays.

11          Plaintiffs are also extremely concerned that by defendants own description of their policies, the

12  new regulations have preserved discretionary, unbounded grounds for USCIS delay in issuing documents

13  where the agency has any concern for "national security."  Defs' Mot. at 9, n.6.  Sposato testified that

14  delay in the issuance of documentation would occur only where national security is a "significant concern,"

15  but plaintiffs are unconvinced by self-imposed restrictions and one official's promise of restraint in the

16  invocation of the policy.  See May 4, 2005 Sposato Dep. at 140:17-22.  This court need not wade into the

17  parties' venomous debate over the importance of the government's interest in reserving a category of

18  immigrants for special processing, as this question goes to the merits of the legal claims before this court.

19  Adjudication of plaintiffs' claims will reveal whether DHS had established disciplined grounds for triggering

20  this special treatment, or whether totemic use of the term "national security" will provide shelter for various

21  permutations of bureaucratic errors, administrative backlogs, inter-agency communication lapses, or

22  rootless security justifications.  For present purposes, the significance of USCIS representations on national

23  security cases is that there remains an express category of applications to which the agency believes it has

24  no ministerial duty of timely documentation.  Whether or not this is a proper characterization of their duties,

25  it is extremely significant to the mootness analysis here, because defendants in fact have expressly refused to

26  commit to "completely and irrevocably eradicat[ing]" delays between adjudication and documentation of

27  status.  See Norman-Bloodsaw, 135 F.3d at 1274 (quoting County of Los Angeles v. Davis, 440 U.S.

28

625, 631-32 (1979)).

A smaller but nevertheless additional concern is that newly-adjudicated LPRs served by extremely busy USCIS sub-offices are not permitted to book the first available appointment to initiate documentation if appointments at the office are fully-booked for the two-week window USCIS is permitted to open for scheduling.  May 4, 2005 Sposato Dep. at 66:2-68:18; May 23, 2005 Sposato Dec. ¶ 4 (describing availability of appointments in the "overwhelming majority" of USCIS districts, but noting that some districts continue to experience appointment capacity challenges that the department is struggling to correct).  In other words, an LPR must return to the USCIS office every day until an appointment within the next two week period opens for processing, and the USCIS has no means of tracking how many times an individual must return to the office before actually obtaining an appointment.  May 4, 2005 Sposato Dep. at 66:11-19.  Without passing premature judgment on the rationale or efficiency of such a system, it further undermines certainty that delays in the issuance of documentation will evaporate for all class members.

In addition to the specific features of the new policy that raise concerns,[8] analysis of whether defendants have the commitment or capacity to prevent delays in documentation must be tempered by the fact that the present class action lawsuit has driven agency behavior in this case, and that agency action has in turn fueled repeated justiciability challenges to plaintiffs' claims.  Attorneys for the government contacted local offices directly to initiate and process plaintiffs' security clearances and issue documents and in some cases manually triggered expedited FBI clearance checks.  See Sposato Dep. at 165:12-17 ("[t]he attorneys certainly watched these cases and worked with the district to have them accomplished.  I don't know whether you would characterize that as special attention.  Normally attorneys are not focused on individual cases that are not in lawsuits").  See also id. at 163:5-165:17, 170:8-18.  Given this testimony and the precision timing with which every one of the original and amended named plaintiffs' persistent, long-neglected requests for documentation were processed, this court is left with no doubt that the filing of the present action directly caused, rather than correlated with, the issuance of documentation for named plaintiffs, and thus the attempted mooting of their claims.[9]  See Sze v. Immigration and Naturalization Serv., 153 F.3d 1005, 1008 (9th Cir. 1998) (holding that correlation was inadequate to substantiate plaintiffs'

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   suspicions that litigation-related timing drove disposition of named plaintiffs' applications for naturalization).

2   See also 8/9/04 Defs' Opp'n to Class Cert. (arguing for dismissal and denial of class certification because

3   named plaintiffs' claims were mooted by post-complaint resolution of their requests for documentation of

4   status).

5           This is precisely the sort of strategic behavior identified as grounds for tempering invocation of

6   mootness principles.  See Zeidman v. McDermott, 651 F.2d 1030, 1050 (5th Cir. 1981) (holding that a

7   motion for class certification need not be dismissed for mootness where defendants, perhaps strategically,

8   have tendered resolution of individual plaintiff's claims).  While the record before this court does not evince

9   that the DHS changed its regulations to move security clearances outside the reach of the plaintiffs' class

10  action, the context of the case casts some doubt on defendants' capacity or will to address the needs of the

11  class as a whole, rather than simply target agency action for purposes of evading review.

12          As a last consideration, the policy changes at issue here involve EOIR practices for documenting

13  adjustment of immigration status—a mighty ship indeed, and one that cannot easily change course, even

14  with well-intentioned officials at the helm.  See Aug. 4, 2004 Sposato Dec. ¶ 12 (describing the motive to

15  change the timing of security checks as for the sake of national security and "to reduce the waiting time for

16  documentation for aliens who are granted status by the immigration courts").  Although the former systems

17  of security checks and documentation processing have been redirected, the lack of specific regulatory

18  commitment to efficient processing in the context of an enormous and often cantankerous bureaucracy begs

19  skepticism of immediate and holistic resolution of the claims in this case.  The record demonstrates that

20  many species of bureaucratic ineptitude led to long waiting periods for documentation, including failures to

21  systematize requests for documentation, failure to notify immigrants and attorneys on systems for requesting

22  documentation, oversights and confusion in responding to such requests, administrative backlog, and other

23  problems.  It would be folly to assume that a system alleged and partially admitted to be overwhelmed and

24  riddled with blockages on March 31, 2005 is suddenly seamless on April 1, 2005.

25          Plaintiffs' claims remain alive, and they are entitled to seek evaluation and potential enforcement

26  of DHS ministerial obligations.  Of course, the fact that this case is not technically moot does not preclude

27  defendants' opportunity to show that "the likelihood of further violations is sufficiently remote to make

28

1    injunctive relief unnecessary." See United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199,

2    203 (1968).  That is a question for a future day.

3        **B.    Standing**

4        Defendants raise the additional argument that class members covered by the April 1 regulations

5    do not face imminent injury based on concrete and particularized harms.  See Lujan, 504 U.S. at 564, n.2

6    (stating that the elastic concept of imminent injury cannot be stretched beyond its Article III purpose of

7    limiting speculation and ensuring that the injury is "certainly impending").  Defendants' argument on this

8    score attempts to reopen the final disposition by this court on October 12, 2005 on an improper basis.  The

9    proper mechanism for a renewed justiciability challenge based on an intervening change in regulation is

10   mootness, which captures the dissolution of plaintiffs' interest during the litigation due to changed

11   circumstances. "The doctrine of mootness can be described as the doctrine of standing set in a time frame:

12   The requisite personal interest that must exist at the commencement of the litigation (standing) must continue

13   throughout its existence (mootness)."  Friends of the Earth, Inc. v. Laidlaw Envtl. Srvs., 528 U.S. 167,

14   189-90 (2000).  Defendants are not entitled to reopen this court's holding that delay in the issuance of

15   documentation of LPR status is a cognizable injury, rather, they are simply entitled to challenge that the

16   causes of that injury are on-going.

17       **C.    Ripeness**

18       As a final attack on the justiciability of plaintiffs' complaint, defendants argue that the claims of

19   class members granted LPR status under the new policy regime are unripe.  In contrast to the numerous

20   cases cited in this order in which mootness is deemed the proper analytical lens for justiciability challenges

21   due to intervening changes in events, this court cannot find--and defendants cannot cite--a single case

22   finding that a case has de-ripened after an initial finding of Article III jurisdiction, nor any in which ripeness

23   analysis is used to explore on-going justiciability in light of changed circumstances.[10]  Ripeness is a doctrine

24   of jurisdiction to be determined at the commencement of the litigation rather than, as a district court of this

25   Circuit aptly stated, "a moving target affected by a defendant's action."  Malama Makua v. Rumsfeld, 136

26   F. Supp. 2d 1155, 1161 (D. Haw. 2001).  While each level of federal adjudication must evaluate all

27   dimensions of Article III justiciability before accepting jurisdiction to hear the case or appeal, it is the

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

15

1   dimension of mootness that captures changed circumstances during a single court's adjudication.  See Reno

2   v. Catholic Social Services, Inc., 509 U.S. 43, 73 (1993) (holding that while it was the circumstances at the

3   "time of the initial complaints" which governed district court analysis of ripeness, it was the circumstances at

4   the time of appeal which governed the Supreme Court's independent analysis of its Article III jurisdiction).

5   The proper question before this court was whether defendants carried their burden to show that the new

6   DHS policies will eradicate the harms alleged.

7

8

9   II.        Justiciability of Pre-April 1, 2005 Class Member Claims

10          The situation of those plaintiffs who were granted LPR status prior to the policy change on April

11   1, 2005 is in real terms unchanged.  Other than the named plaintiffs whose documentation was requested

12   personally by government attorneys, nothing about the passing of that date affects the circumstances of the

13   class as a whole.  Indeed, defendants have not drawn this court's attention to a single institutional

14   commitment or mechanism for efficient processing of the backlog predating the new regulations.[11]  Sposato

15   has represented that the number of persons in this category is "diminishing rapidly as these LPRs make their

16   appointments with USCIS for documents and our offices finish administrative processing," but she has also

17   testified that the prior system's failure to delineate and promulgate responsibility for initiating processing of

18   LPR documentation meant that  USCIS often did not know of EOIR grants of status and could not begin

19   processing.  See May 23, 2005 Second Supp. Sposato Dec. ¶ 11; May 4, 2005 Sposato Dep. at 55:7-

20   10.  The USCIS website now carries a statement informing any person adjudicated to be an LPR to make

21   an appointment for documentation (or, in the case of pre-April 1, 2005 LPRs, to commence background

22   checks), but this gesture promises meager relief given the enormous communication gaps and administrative

23   confusion alleged in this case.  See May 23, 2005 Second Supp. Sposato Dec. ¶ 5.  Given the presumably

24   enormous increase in the number of persons subjected to security investigations as of April 1, 2005

25   (because the new regulations require that all applicants for adjustment of status, rather than all recipients,

26   must be investigated), there is even less basis for confidence that the backlog will be timely cleared.

27          Even if this court had deemed the post-April 1, 2005 class members' claims mooted by the new

28

16

1    regulations, the claims of the pre-existing class members would survive.  Apart from the dispositive fact that

2    the current class is not constantly shrinking (but rather, constantly changing), this case is quite distinct from

3    Sze v. I.N.S., a case argued by defendants.  In Sze, the Ninth Circuit held that a change in immigration

4    policy mooted future class members' claims as well as the claims of the "constantly shrinking" numbers of

5    persons still governed by the pre-existing policies.  See 153 F.3d 1005, 1010 (9th Cir. 1998).  First of all,

6    this court certified the present action as a justiciable class action before the intervening change in legislation,

7    thus taking it outside of the ambit of a large swath of pre-certification reasoning in Sze in which the burden

8    was on plaintiffs to show justiciable class claims.  See id. at 1009.  Secondly, the class at issue in the

9    present case is quite large, and the record in this case gives this court no confidence that, as in Sze, the

10   class will systematically shrink based on the steady resolution of pending applications.  See id. at 1010.

11   Testimony by USCIS official Janis Sposato described a system fraught with gaping procedural holes, one in

12   which the USCIS is not receiving information about past LPR grants by the EOIR and therefore cannot

13   proceed with security checks, let alone documentation.  May 4, 2005 Sposato Dep. at 55:7-16.  If that is

14   indeed shown to be the case, the shrinking of the pre-April 1, 2005 portion of the class will be irregular and

15   indefinitely incomplete.

16          Independent of this distinctions the present action also concerns delays and hardships not

17   contemplated in Sze.  Plaintiffs in the present action seek to address the adjustment of status to legal

18   permanent residence, a status which drastically expands an immigrants' rights to work, travel, and receive

19   most public and educational benefits.  Furthermore, they allege that persons deemed LPRs by an EOIR

20   court but living without documentation of that status are denied not only those privileges associated with

21   their newly earned LPR status, but the renewal of those work privileges associated with their pre-

22   adjustment status.  The hardships represented by this purgatory between adjudication and documentation is

23   far beyond the realm of Sze, which contemplated an immigration "jump" from LPR to citizen.  Though

24   naturalization is the highest attainment of our immigration system and grants bedrock political rights and

25   freedoms, it cannot reasonably be said that it equates to those hardships alleged and risked in the present

26   action.  The hardships alleged are compounded by a final distinction from Sze, namely that the time periods

27   at issue are expansive, with plaintiffs adjudicated before April 1, 2005 allegedly waiting up to two years for

28

1    documentation of a grant of LPR status.  Such a time frame represents hardships far beyond the 120 day

2    concerns at issue in Sze, particularly if the case bears out that plaintiffs are unable to renew their pre-

3    adjudication immigration statuses during this waiting period.  Such a "demotion" in the immigration hierarchy

4    to a position not unlike undocumented aliens is a drastically different situation than a naturalization delay for

5    green card holders, who do retain rights to work and travel, as well as other benefits.

6          Therefore, this court holds that plaintiffs granted LPR status prior to the enactment have shown a

7    live controversy with defendants for which no resolution has been tendered.  This portion of the class may

8    proceed with their claims.

9

10   III.    Decertification of the Class

11          Under Federal Rule of Civil Procedure 23, a court may amend or revoke certification of a class

12   action before final judgment.  See Fed. R. of Civ. Pro. 23 (c)(1)(C), 23(d)(4).  Such decisions are

13   committed to the sound discretion of the district court.  Armstrong v. Davis, 275 F.3d 849, 871, n.28 (9th

14   Cir. 2001).  Defendants' arguments for decertification of the class rely explicitly on a finding that the claims

15   of LPRs adjudicated post April 1, 2005 were mooted by the changed regulations.  See Defs' Mot. at 14-

16   15.  Other than this challenge to the size and cohesion of the class, defendants have identified no basis for

17   decertification.

18          Taking up the question in light of finding that the case remains a live controversy, this court finds

19   no grounds for decertifying the class.  See Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160

20   (1982) (holding that "[e]ven after a certification order is entered, the judge remains free to modify it in the

21   light of subsequent developments in the litigation").  Without dismissal of class member claims, numerosity

22   remains unchanged.  As discussed throughout this order, class members adjudicated by the EOIR at any

23   time are united by the common question of fact (defensive adjustments of status through the courts of EOIR

24   and attempts to obtain documentation of that adjusted status) and law (defendants' ministerial duty to issue

25   LPR documentation in a timely fashion).  Individual variation among plaintiffs' questions of law and fact

26   does not defeat underlying legal commonality, because "the existence of shared legal issues with divergent

27   factual predicates is sufficient" to satisfy Rule 23.  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

18

UNITED STATES DISTRICT COURT
For the Northern District of California

Cir. 1998).  As discussed in this court's prior order and unchallenged here, the interests and injuries represented by the named plaintiffs still satisfy the typicality and representativeness dimensions of Rule 23 analysis. See Santillan v. Ashcroft, 2004 WL 2297990, *11-12 (N.D. Cal. 2004) (Patel, J.).

At the parties' next appearance, this court will consider division of the class into two sub-classes distinguished on the basis of class members' date of EOIR adjudication (i.e., a pre-April 1, 2005 and post-April 1, 2005 sub-class), as well as the addition of one or more named plaintiffs adjudicated to be an LPR on or after April 1, 2005.

CONCLUSION

Based upon the foregoing, defendants' motion to dismiss is DENIED.

IT IS SO ORDERED.

Dated:   July 1, 2005

Marilyn Hall Patel
United States District Court Judge
Northern District of California

19

ENDNOTES

1. The present class action concerns only those aliens who are removable from the United States and placed in immigration proceedings with the constituent courts of the EOIR. Class members have been granted permanent residency as relief from removal, often referred to as a "defensive" adjustment of status. See Aug. 9, 2004 Sposato Dec. ¶ 2. The class does not encompass those persons who apply for "affirmative" adjustment of status based on a direct application to the USCIS for an immigration benefit. See id. ¶ 1.

2. The USCIS is a division of the Department of Homeland Security (referred to herein as "DHS") which is responsible for administering immigration laws.

3. The persons excluded from the class were 34 individual plaintiffs served by the Miami, Florida USCIS district office and persons granted LPR status by immigration courts located in Harlingen, Houston, and San Antonio, Texas. See Lopez-Amor, et al. v. U.S. Attorney General, et al., No. 04-CV-21685 (S.D. Fla.); Padilla, et al. v. Ridge, et al., No. M 03-126 (S.D. Tex.).

4. It was unclear to the court whether FBI disposition dates cited in the record are the last step in the sequence of security clearances, as plaintiffs implicitly suggest. However defendants did not dispute plaintiffs' interpretation of the record on this point in their reply, and therefore the court assumes that these dates indeed mark the completion of defendants' security clearance process.

5. In these plaintiffs' cases, it is conceivable that background checks completed one to six months prior to adjudication were deemed stale by the EOIR or USCIS. If this is the case, and the current system still requires security clearances to be conducted immediately prior to adjudication in order to qualify as up to date, then this court has even greater grounds for skepticism of efficiency under the new system. If background checks must be timed for completion within days or weeks of EOIR completion, then briefing cycles, continuances, and other common sources of delay in the immigration courts will routinely cause the expiration of background checks, creating the same inter-agency feedback loops of delay alleged under the current system.

6. However, on this last cause of delay and any other in which the causes of delay are exceptional or idiosyncratic, defendants are correct they do not establish a system of practices and policies that this court can evaluate in the class action context.

7. The discussion herein is confined to criticisms of the policy relating exclusively to the post-adjudication period. The policy consequences of relocating delays to pre-adjudication time periods are unreached by the class certified in this action. But the court cannot help but note that the policy changes also beg three glaring, interrelated questions: (1) whether delays in the system have merely been relocated to pre-hearing time periods, (2) whether the new policy will cause a radical increase in the number of security investigations that must take place (because every applicant for immigration relief must be cleared, rather than merely those few who are granted the sought relief), and (3) whether the increased numbers of

20

clearances required by (2) above will further prolong security clearance times.

8. As a matter of policy logic, the court could predict many additional sources of potential delay caused by the changed regulations, such as administrative backlog before and after adjudication of LPR status, new communication gaps in the system (such as between EOIR, ICE, and USCIS), failure to implement the new policy, or bureaucratic ineptitude.  However, the deference due to federal agencies prior to the settling of newly-minted policies would caution against such an enterprise, as would the preference for adjudication in concrete settings which underlies all Article III justiciability analysis. The court therefore confines its analysis to those indicators of delay which are specifically evinced in the named plaintiffs' records and the parameters of the regulations themselves.

9. Indeed, the record before this court contains a fax coverpage from the USCIS giving "expedited manual FBI name check" results for original named plaintiff Rafaela Valdez-Parra and bearing the handwritten note "Santillan mandamus care."  See Rhyu Dec., Exh. 10 at 006128.  See also Rhyu Dec., Exh. 10 at 000666.

10. Defendants do not even defend their ripeness challenge to the present action in their reply.

11. Defendants distort the language of the federal register when they argue that it expressly commits to swift processing of investigations unresolved by April 1, 2005.  See Defs' Mot. at 14.  The regulations speak of "avoid[ing] unnecessary delays," "swift responses" for the sake of national security, and allowing a "reasonable period of time" for the DHS to process background checks, but these and other comments of describing time needed to complete background checks all refer to the new system.  70 Fed. Reg. 4743-01, 4747.