1
2
3
4
5
6
7            UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9

10   MARIA SANTILLAN, et al., on behalf of
     themselves and others similarly situated,
11                                                        No. C 04-2686 MHP
                              Plaintiffs,
12   v.                                                  **MEMORANDUM AND ORDER**

13   ALBERTO R. GONZALES, Attorney General
     of the United States; MICHAEL CHERTOFF,
14   Secretary of the Department of Homeland
     Security; THE UNITED STATES
15   CITIZENSHIP AND IMMIGRATION
     SERVICES (USCIS); EDUARDO AGUIRRE,
16   JR., USCIS Director; DAVID STILL, USCIS
     San Francisco District Director,
17
                              Defendants.
18
                                                    /
19

20        Plaintiffs Maria Santillan, et al. represent a class of persons who have been or will be granted

21   lawful permanent resident status by the Justice Department's Executive Office of Immigration

22   Review and to whom the United States Citizenship and Immigration Services has failed to issue

23   evidence of status as a lawful permanent resident.  Following this court's denial of defendants'

24   motion to dismiss, plaintiffs have moved for summary judgment that defendants' failure to issue

25   evidence of status violates the Administrative Procedure Act (hereinafter "APA") and the Due

26   Process Clause of the Fifth Amendment.  Defendants have cross-moved for summary judgment that

27   the claims of certain class members are nonjusticiable, and that defendants' failure to issue evidence

28   of status is lawful and reasonable.  Having considered the arguments of the parties, and for the

reasons set forth below, the court issues the following order.

BACKGROUND

Named plaintiffs Maria Santillan, et al., were granted the status of lawful permanent resident ("LPR") by Immigration Judges or by the Board of Immigration Appeals, constituent courts of the Justice Department's Executive Office of Immigration Review ("EOIR").[1]  Following the EOIR's determination, plaintiffs sought documentation of their adjusted status as LPRs from their local United States Citizenship and Immigration Services ("USCIS") sub-office, through a process called Alien Documentation, Identification and Telecommunication ("ADIT") processing.[2]

Prior to September 11, 2001, plaintiffs would generally have been able to obtain temporary documentation of their adjusted status within a week of presenting a copy of the order issued by the EOIR to their local USCIS sub-office.  Statement of Undisputed Facts (hereinafter "SUF") ¶ 17; see Chen Dec. Ex. I at 28:22-29:14.  Beginning some time after September 11, 2001, the Department of Homeland Security ("DHS"), which oversees USCIS, changed the policy for applicants for documentation.  Under the new policy, all applicants for documentation of adjusted status have been required to undergo background and security checks involving multiple federal agencies.  SUF ¶ 24; see Aug. 9, 2004 Sposato Dec. ¶¶ 1–9.  Until those checks are completed, the USCIS has not been permitted to issue any immigration benefit to plaintiffs, such as adjustment of status to lawful permanent residency or the issuance of temporary documentation verifying LPR status.  SUF ¶ 23; see Aug. 9, 2004 Sposato Dec. ¶¶ 11–12.

Under these new procedures, persons granted LPR status waited from several months to over one year for the commencement of their ADIT processing, in addition to weeks or months for the completion of processing and the issuance of documentation verifying LPR status.  SUF ¶ 32.  As many as 12,539 persons adjudicated to be LPRs after October 1, 2000 may not have received documentation of status from USCIS.  SUF ¶¶ 64–65.  During the post-adjudication, pre-documentation period, some class members lost work and travel authorization due to the expiration of their former immigration status, the refusal of agencies to renew work authorizations due to the

2

1   immigrants' adjustment to LPR status, and lack of documentation of their new LPR status.  SUF ¶¶

2   51–55, 67, 70, 96–98, 100.

3        On July 4, 2004, plaintiffs filed an action for declaratory and injunctive relief, seeking to

4   compel defendant officials to issue LPRs evidence of their adjusted legal status "in a timely manner."

5   On October 12, 2004, this court certified plaintiffs' claims as a class action.  See Santillan v.

6   Ashcroft, 2004 WL 2297990 (Oct. 12, 2004 N.D. Cal.) (Patel, J.).

7        On April 1, 2005 after class certification in this action, a new system of EOIR regulations

8   went into effect which reorganized the procedures governing security and law enforcement

9   investigations of putative class members in several ways.  Most significantly, the new regulations

10  repositioned the timing of security examinations of applicants, requiring those examinations to be

11  completed *before* an alien's *application* for adjustment of status can be heard by an immigration

12  judge, rather than *after* a *grant* of adjusted status.  See generally 8 C.F.R. § 1003.47.

13       Specifically, the new regulations change the timing, notice, and allocation of responsibility

14  for security checks.  At the front end, at any hearing in which an alien files or expresses intent to file

15  an application for relief that is subject to background checks, the "DHS shall notify the respondent of

16  the need to provide biometrics and other biographical information and shall provide a biometrics

17  notice and instructions to the respondent for such procedures."  Id. § 1003.47(d).  Immigration

18  judges are instructed to account for security processing in scheduling hearings, and security checks

19  must be conducted "as promptly as is practicable (considering, among other things, increased

20  demands placed upon such investigations)."  Id. § 1003.47(e).  Where investigations are incomplete

21  by the time of the hearing, the immigration judge may grant a continuance or hear the case on the

22  merits; however, the judge may not grant an application for immigration relief if the examinations

23  are incomplete or not current.  Id. § 1003.47(f)–(g).  See also Id. § 1003.1 (instructing that the Board

24  of Immigration Appeals shall not issue a decision affirming or granting an alien an immigration

25  status, benefit, or relief that requires completion of security investigations if such investigations have

26  not been completed during the proceedings, the results of prior investigations are no longer current,

27  or investigations have uncovered any information bearing on the merits of the alien's application).

28

1   Where an investigation is complete and an immigration judge has granted LPR status, the "decision

2   granting such relief shall include advice that the respondent will need to contact an appropriate office

3   of DHS." Id. § 1003.47(i).  The new regulatory scheme affects only EOIR processes, with no

4   instructions or guidelines for USCIS issuance of documentation.

5        Defendants moved to dismiss in light of the new regulations, arguing that the claims of

6   plaintiffs adjusted by the EOIR after April 1, 2005 ("post-April 1 plaintiffs") are either moot or not

7   yet ripe, and that the class of plaintiffs adjusted by the EOIR before April 1, 2005 ("pre-April 1

8   plaintiffs") is rapidly shrinking and will disappear without the intervention of this court.  On July 1,

9   2005 this court denied defendants' motion.  See Santillan v. Ashcroft, No. C 04-2686 (N.D. Cal.

10  July 1, 2005) (Patel, J.).  In denying defendants' motion this court noted that the ripeness

11  requirement does not provide the proper framework in which to analyze the justiciability of the

12  claims of the post-April 1 plaintiffs.  Rather, the proper question was whether the change in

13  regulations on April 1 rendered the claims of certain class members moot.  This court concluded that

14  the post-April 1 plaintiffs are likely to experience delays related to the same internal communication

15  difficulties and other bureaucratic inefficiencies that have affected the pre-April 1 plaintiffs, and that

16  their claims are therefore not moot.  Finally, this court noted that the April 1, 2005 change in

17  regulations might require dividing the existing class into two subclasses.

18       In the Statement of Undisputed Facts accompanying these motions for summary judgment,

19  the parties list the following facts relevant to the post-April 1 plaintiffs.  First, some of the delay

20  experienced by pre-April 1 plaintiffs is attributable to misrouted files, inefficiency, and human error.

21  SUF ¶ 43.  USCIS makes use of the same types of files and procedures in processing the applications

22  of at least some post-April 1 plaintiffs.  SUF ¶ 44.  USCIS does not ensure that the applications of

23  post-April 1 plaintiffs are processed within a prescribed period of time.  SUF ¶ 45.  Nor does USCIS

24  track the number of times a post-April 1 plaintiff makes requests for documentation.  SUF ¶¶ 40–42.

25  Finally, the security checks that were previously done following determination of status, and on

26  which USCIS places much of the blame for delays experienced by pre-April 1 plaintiffs, usually take

27  no more than 48 hours to complete.  SUF ¶¶ 27–28.

28

4

Based on the continued failure of pre-April 1 class members to obtain documentation and evidence that administrative delays will persist for post-April 1 class members, plaintiffs move for summary judgment that defendants are improperly withholding permanent documentation of status, and that Defendants' decision to cease providing temporary documentation was arbitrary and capricious. Defendants move for summary judgment that the DHS is not in violation of its duty to provide documentation, and that the decision to cease issuing temporary documentation was rational. Defendants also argue in the alternative, as in their earlier motion to dismiss, that the claims of the post-April 1 class members are not yet ripe.

LEGAL STANDARD

I.     Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The moving party for summary judgment bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations, and inferences to be drawn from the facts

5

1   must be viewed in the light most favorable to the party opposing the motion.  Masson v. New Yorker

2   Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

3        The moving party may "move with or without supporting affidavits for a summary judgment

4   in the party's favor upon all or any part thereof."  Fed. R. Civ. P. 56(a).  "Supporting and opposing

5   affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in

6   evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

7   therein."  Fed. R. Civ. P. 56(e).

8

9   II.     Subclass Certification

10       Under Federal Rule of Civil Procedure 23(c)(4)(B), a class may be divided into subclasses

11  when appropriate.  A court may certify subclasses after initial class certification.  Fed. R. Civ. P.

12  23(c)(1)(C).  A court may divide a class into subclasses on motion of either party, or *sua sponte*.

13  Burka v. New York City Transit Authority, 110 F.R.D. 595, 603-04 (S.D.N.Y. 1986).

14

15  III.    Mootness

16       The jurisdiction of federal courts depends on the existence of a "case or controversy" under

17  Article III of the Constitution.  PUC v. FERC, 100 F.3d 1451, 1458 (9th Cir. 1996).  "A claim is

18  moot if it has lost its character as a present, live controversy."  American Rivers v. National Marine

19  Fisheries Service, 126 F.3d 1118, 1123 (9th Cir. 1997) (citing American Tunaboat Ass'n v. Brown,

20  67 F.3d 1404, 1407 (9th Cir. 1995)).  "In the context of declaratory and injunctive relief, [a plaintiff]

21  must demonstrate that she has suffered or is threatened with a concrete and particularized legal harm,

22  coupled with a sufficient likelihood that she will again be wronged in a similar way."  Bird v. Lewis

23  & Clark College, 303 F.3d 1015, 1019 (9th Cir. 2002) (internal quotation marks and citation

24  omitted), cert. denied, 538 U.S. 923.  Where the activities sought to be enjoined have already

25  occurred and the courts "cannot undo what has already been done, the action is moot."  Friends of

26  the Earth, Inc. v. Bergland, 576 F.2d 1377, 1379 (9th Cir. 1978).  "The burden of demonstrating

27  mootness is a heavy one."  Northwest Environmental Defense Center v. Gordon, 849 F.2d 1241,

28

6

1   1243 (9th Cir. 1988).

2          A defendant's voluntary cessation of a challenged practice does not render a case moot unless

3   the party asserting mootness meets the "heavy burden" of showing that it is "absolutely clear the

4   allegedly wrongful behavior could not reasonably be expected to recur." See Students for a

5   Conservative America v. Greenwood, 378 F.3d 1129, 1131, amended by 391 F.3d 978 (9th Cir.

6   2004) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000)).

7   The standard for assessing voluntary cessation is "stringent." Laidlaw, 528 U.S. at 189.

8

9   IV.      Ripeness

10          "Ripeness doctrine protects against premature adjudication of suits in which declaratory relief

11  is sought," Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1044 (9th Cir. 1999) (en banc), in order to

12  prevent "entanglement in theoretical or abstract disagreements that do not yet have a concrete impact

13  on the parties." 18 Unnamed "John Smith" Prisoners v. Meese, 871 F.2d 881, 883 (9th Cir. 1989).

14  The ripeness inquiry contains both a constitutional and a prudential component.  Thomas v.

15  Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).  Ripeness is

16  evaluated at the commencement of a lawsuit, and is not subsequently defeated through changed

17  circumstances.  Malama Makua v. Rumsfeld, 136 F. Supp. 2d 1155, 1161 (D. Haw. 2001).

18

19  V.       APA

20          A.       Jurisdiction under the APA

21          The APA provides for judicial review where "[a] person suffering legal wrong because of

22  agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant

23  statute." 5 U.S.C. § 702.  "'[A]gency action' includes the whole or a part of an agency rule, order,

24  license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

25

26

27

28

7

B.      APA Section 706(2)(A)

Under 5 U.S.C. § 706(2)(A), a court shall hold unlawful agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  When an agency acts either to create or rescind a regulation, it must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983) (citation and internal quotations omitted).

A reviewing court must consider the administrative record before the agency at the time the agency carried out the action.  <u>National Wildlife Federation v. United States Army Corps of Eng'rs</u>, 384 F.3d 1163, 1170 (9th Cir. 2004).

C.      APA Section 706(1)

Under 5 U.S.C. § 706(1), a court "shall...compel agency action unlawfully withheld or unreasonably delayed."  The elements of a claim under § 706(1) are a discrete, ministerial duty; a delay in carrying out that duty; and a determination that the delay was unlawful or unreasonable in light of prejudice to one of the parties.  <u>Norton v. Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 124 S. Ct. 2373, 2378–80 (2004); <u>Rockbridge v. Lincoln</u>, 449 F.2d 567, 569–73 (9th Cir. 1971).

The Ninth Circuit has adopted a six-factor test for determining when an administrative delay is unreasonable.

(1) the time agencies take to make decisions must be governed by a "rule of reason";

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

8

1    (5) the court should also take into account the nature and extent of the interests

2    prejudiced by delay; and

3    (6) the court need not find any impropriety lurking behind agency lassitude in order to

4    hold that agency action is unreasonably delayed.

5    Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC");

6    Brower v. Evans, 257 F.3d 1058, 1068-69 (9th Cir. 2001) (utilizing the TRAC considerations to

7    evaluate the reasonableness of agency delay).

8

9    DISCUSSION

10    _____Before reaching the merits of the parties' dispositive arguments, this court must first resolve

11    three preliminary questions.  First, the court must determine if, in light of the April 1, 2005 changes

12    to EOIR regulations, the existing certified class should be divided into two subclasses.  Second,

13    defendants renew in their motion for summary judgment the argument that the claims of class

14    members adjudicated by the EOIR after April 1, 2005 are not yet ripe.  Third, defendants move for

15    additional discovery under Federal Rule of Civil Procedure 56(f) in order to respond to certain

16    affidavits included by plaintiffs with their motion.

17

18    I.    Subclass Certification  for Pre- and Post-April 1, 2005 Plaintiffs

19    _____At the conclusion of the order denying defendants' motion to dismiss, this court noted that it

20    would consider dividing the certified class into two subclasses distinguished on the basis of the class

21    members' date of EOIR adjudication (i.e., a pre-April 1, 2005 subclass and a post-April 1, 2005

22    subclass).  The court finds that the change in regulations on April 1 and differences in the factual

23    record for pre- and post-April 1 class members weigh in favor of dividing the existing class into two

24    subclasses.

25    Under the post-April 1, 2005 regulations, an immigration judge will not hear an alien's

26    application for LPR status until the judge receives confirmation that security checks for the class

27    member are complete and up to date.  In addition, immigration judges and the BIA are not able to

28

9

UNITED STATES DISTRICT COURT
For the Northern District of California

1    grant or affirm LPR status if the security checks have uncovered information bearing on the merits of

2    the alien's application.  As a result, all class members adjudicated to be LPRs under the post-April 1,

3    2005 regulations have already been determined, to the extent possible, not to be a security risk.  In

4    contrast, class members processed under the pre-April 1, 2005 regulations may not have completed

5    security checks prior to being granted LPR status.  This distinction has bearing on defendants'

6    national security arguments, which have substantially less merit when applied to an LPR already

7    determined not to be a known threat.

8            The undisputed factual record is also different for pre- and post-April 1 class members in

9    significant ways.  Defendants have stipulated that up to 12,359 members of the pre-April 1 group

10   still await permanent documentation, but have made no such stipulation for the post-April 1

11   subclass.  SUF ¶ 65.  Defendants have also stipulated that some pre-April 1 class members have

12   waited more than a year following their EOIR adjudication without receiving evidence of status.

13   SUF ¶ 32.  Defendants have made no such stipulation with respect to post-April 1 class members;

14   nor could defendants do so, as the time elapsed since the new regulations went into effect is less than

15   five months.  Based on these differences in the factual record and the effect of the new regulations on

16   the parties' legal arguments, the court finds that the class should be divided into two subclasses.

17           The first subclass (the "pre-April 1 subclass") consists of all those persons who were or will

18   be granted lawful permanent resident status by the EOIR under regulations in effect prior to April 1,

19   2005 through the Immigration Courts or the Board of Immigration Appeals of the United states, and

20   to whom USCIS has failed to issue evidence of registration as a lawful permanent resident, with the

21   exception that the class excludes the 34 named plaintiffs in Lopez-Amor v. United States Attorney

22   General, No. 04-CV-21685 (S.D. Fla.) and the plaintiff class in Padilla v. Ridge, No. M 03-126 (S.D.

23   Tex.).

24           The second subclass (the "post-April 1 subclass") is identical to the first subclass, with the

25   sole difference that the persons in the second subclass were or will be granted lawful permanent

26   resident status by the EOIR under regulations in effect on April 1, 2005 or thereafter.

27

28

                                                    10

1    Plaintiffs have already identified at least two class members who received EOIR adjudication

2    on or after April 1, 2005.  Chen Dec. Ex. T.  Defendants have noted, however, that one of the class

3    members identified by plaintiff, adjudicated to be a LPR on April 1, 2005 was actually processed

4    under the pre-April 1, 2005 regulations and had therefore not gone through security screening prior

5    to adjudication.  Given this court's decision to divide the class into two subclasses, plaintiffs are

6    ordered to file a list of named members of the post-April 1 subclass, including any required

7    disclosures, within 30 days of this order.

8

9    II.    Justiciability of Post-April 1, 2005 Class Member Claims

10    In their motion for summary judgment, defendants repeat the ripeness argument previously

11    advanced in the context of defendants' motion to dismiss.  Defendants assert that their adoption of

12    new regulations for the processing of status documentation has "de-ripened" the claims of the post-

13    April 1 subclass.

14    This argument is both legally incorrect and procedurally improper.  As this court has already

15    explained, ripeness is evaluated at the commencement of each stage of litigation.  None of the cases

16    cited by defendant suggests that a claim can "de-ripen" over time.  All of the cases consider precisely

17    the opposite situation:  where the passage of time during litigation has caused claims that were

18    arguably not yet ripe when the lawsuit was filed to ripen.  See, e.g., Buckley v. Valeo, 424 U.S. 1,

19    681 (1976) ("the date of their all but certain exercise is now closer by several months than it was at

20    the time the Court of Appeals ruled"); American Motorists Ins. Co. v. United Furnace Co., 876 F.2d

21    293, 302 (2d Cir. 1989) (finding that plaintiff's claim was ripe both at the time of the district court's

22    dismissal and on appeal).  Claims do not de-ripen; they become moot.

23    When a defendant makes a change to the challenged practice during the course of litigation,

24    the proper framework for analyzing the effect of that change is the "voluntary cessation" doctrine, a

25    subspecies of mootness.  This court has already ruled that defendants have failed to show that the

26    adoption of the new regulations has "completely and irrevocably eradicated the effects of the alleged

27    violation."  See Norman-Bloodsaw v. Lawrence Berkeley Labs., 135 F.3d 1260, 1274 (9th Cir.

28

11

1   1998).  This argument already has been put to rest.  It is not an appropriate issue to revisit on

2   summary judgment.

3

4   III.      Defendants' Motion to Strike

5          Defendants raise a second threshold question in their separate motion to strike:  whether

6   plaintiffs can use the twenty affidavits attached as Exhibit T to the Chen Declaration in support of

7   their motion for summary judgment.  The affidavits contain statements of twenty aliens who are not

8   named plaintiffs, but who have been adjudicated to be LPRs and had not yet received documentation

9   of status as of the time of the affidavits.  Defendants do not dispute that these affidavits are based on

10  the "personal knowledge" of the affiants, that they set forth facts that would be admissible in

11  evidence should the affiants testify at trial, or that the affiants are "competent to testify to the matters

12  stated therein."  See Fed. R. Civ. P. 56(e).  Defendants assert instead that affidavits from fact

13  witnesses must be "tested" through deposition of those witnesses.

14         Defendants cite no authority establishing a per se rule that fact witnesses must be made

15  available for deposition before their affidavits may be used in support of a motion for summary

16  judgment.  Rather, defendants claim that under Rule 56(f) they are entitled to conduct additional

17  discovery to rebut the claims made in the new affidavits.  In particular, defendants wish to determine

18  whether the affiants in fact attempted to contact USCIS to obtain documentation, and whether the

19  affiants otherwise complied with the registration requirements.

20         In order to obtain additional discovery under Rule 56(f), the non-moving party must provide

21  affidavits establishing that facts essential to opposing the motion are "unavailable."  Fed. R. Civ. P.

22  56(f); Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1306 (9th Cir.

23  1986).  Defendants argue in their motion to strike and accompanying declaration that many of the

24  named plaintiffs exacerbated the harms associated with delays in issuing documentation by failing to

25  comply with the procedures for obtaining documentation, and that it is likely that the twenty new

26  affiants similarly contributed to any delays they may have experienced.  According to defendants, the

27  facts surrounding each plaintiff's failure to receive documentation are essential because "[t]he legal

28

12

UNITED STATES DISTRICT COURT
For the Northern District of California

1   standards for the claims of Plaintiffs under the Administrative Procedures Act, the Due Process

2   Clause of the Fifth Amendment, and for a writ of mandamus all require a balancing of the actual

3   harms suffered by class members."  Defs.' Opening Brief at 5.

4        As an initial matter, defendants' argument does not apply to plaintiffs' claim under 5 U.S.C.

5   section 706(2)(A), which pertains to the post-September 11, 2001 decision to cease issuing

6   temporary documentation.  In evaluating a claim under section 706(2)(A), this court must examine

7   the administrative record as it existed at the time the policy change took place.  National Wildlife

8   Federation, 384 F.3d at 1170.  The actual harms suffered by plaintiffs four years later, such as those

9   alleged in plaintiffs' affidavits, are irrelevant to this examination.

10       With respect to plaintiffs' claim under 5 U.S.C. section 706(1), it is not clear from

11  defendants' brief and affidavits what essential information might be obtained in additional

12  depositions.  Of the twenty new affiants, nineteen are members of the pre-April 1 subclass.[3]

13  Defendants have already represented in the Statement of Undisputed Facts that up to 12,539

14  members of the pre-April 1 subclass are still awaiting documentation, and that some of the pre-April

15  1 subclass have waited more than a year without receiving evidence of status.  SUF ¶¶ 32, 65.  That

16  plaintiffs may have contributed to delays in individual cases does not contradict or undermine the

17  significance of either undisputed fact.

18       Also, for the post-April 1 subclass, plaintiffs are seeking injunctive relief and do not need to

19  prove past harms for particular class members in order to prevail.  Rather, plaintiffs must show

20  "some cognizable danger of recurrent violation."  United States v. W.T. Grant Co., 345 U.S. 629,

21  633 (1953).  Plaintiffs of course may show this by providing actual examples of post-April 1 delay.

22  On the other hand, as already discussed in the context of this court's order denying defendants'

23  motion to dismiss, and as supported by the parties' joint Statement of Undisputed Facts, defendants

24  have presented no evidence that many of the root causes of delay for the pre-April 1 subclass have

25  been eliminated for the post-April 1 subclass.  The April 1 regulations make no changes to the

26  manner in which USCIS tracks the applications of LPRs or the way in which USCIS interacts with

27  other agencies to process LPR applications for documentation.

28

13

1    Defendants argue that this court should be reluctant to consider granting relief on the basis of

2    uncertain future harm to the post-April 1 subclass because of national security concerns, citing Getty

3    Images News Servs., Corp. v. Department of Def., 193 F. Supp. 2d 112, 117 (D.D.C. 2002).  In Getty

4    Images, the district court considered a news organization's constitutional right to be included in

5    unspecified future "media pools" in combat zones.  Id. at 113–14.   The court concluded that it could

6    not adjudicate "hypothetical disputes in which the specifics of the challenged policies, the relevant

7    factual context, and even the identify [sic] of the injured plaintiff are a matter of conjecture."  Id. at

8    118.  Defendants do not explain how Getty Images is applicable here, where the challenged policies

9    are well-defined, the factual context—delay in issuing documentation—is sufficiently specified, and

10   the plaintiffs are identified by way of the class definition.

11   Defendants have failed to meet their burden under Rule 56(f) in yet another way.  To prove

12   that information is unavailable, the non-moving party must at least show what efforts it made to

13   obtain the information and why those efforts were unsuccessful.  Mason Tenders Dist. Council

14   Pension Fund v. Messera, 958 F. Supp. 869, 894–95 (S.D.N.Y. 1997).  It is undisputed that

15   defendants do not maintain systematic records of each attempt an alien makes to obtain

16   documentation.  SUF ¶¶ 40–42.  Defendants certainly have access, however, to whatever records

17   exist for the contested affiants and could produce whatever relevant information is contained in their

18   files.  At a minimum, defendants could determine whether now, over four months after the last of the

19   affiants was granted LPR status, the affiants have received temporary or permanent documentation.

20   Defendants have not done so.  Nor have defendants presented other evidence that might call the

21   affidavits into question, such as evidence that bureaucratic delays in processing have decreased

22   following the April 1 change in regulations.  As defendants apparently already have access to

23   information that would allow defendants to oppose plaintiffs' motion, it is not clear that further

24   discovery is warranted.  See Mason Tenders, 958 F. Supp. at 895 ("Relief under Rule 56(f) is not

25   appropriate where the discovery allegedly desired pertains to information already available to the

26   non-moving party") (internal quotations omitted).

27

28

14

In order to provide defendants with every reasonable opportunity to oppose plaintiffs' motion for summary judgment under section 706(1), the court will permit defendants to file, within 30 days of this order, additional affidavits in support of their Rule 56(f) motion. The affidavits should first describe the efforts defendants have made to obtain the information by other means, such as consulting the files for the affiants, and explain why sufficient information is not available that would permit defendants to oppose plaintiffs' motion. The affidavits should then clearly set forth the specific facts that defendants hope to obtain in deposition and the reason that the additional facts would preclude summary judgment with respect to either subclass. If defendants carry their burden under Rule 56(f), the court will revisit its ruling with respect to plaintiffs' claim under section 706(1).

Having resolved these preliminary questions, the court now turns to the substance of the cross-motions for summary judgment.

IV.    APA Claims

Plaintiffs assert two violations of the APA that would permit a judicial remedy under 5 U.S.C. section 702. First, plaintiffs claim that defendants' decision following September 11, 2001 to cease issuing temporary documentation was arbitrary and capricious, and not supported by an adequate administrative record, in violation of section 706(2)(A). Second, plaintiffs claim that defendants have a purely ministerial duty to issue documentation of LPR status following a determination by the EOIR and that DHS has no authority to make an independent determination of eligibility. Defendants' delay in issuing documentation is therefore allegedly unlawful or unreasonable, in violation of section 706(1).

Defendants argue that the decision to cease issuing temporary documentation following September 11, 2001 was rational and grounded in sound policy choices. Defendants also assert that USCIS does not have a ministerial duty to issue documentation of LPR status, but rather has broad discretion in deciding when and if to issue documentation. In the alternative, defendants argue that

15

1   even if USCIS has a duty to issue documentation promptly, any delays faced by plaintiffs are

2   reasonable in light of national security concerns.

4        A.    Decision to Cease Issuing Temporary Status Documentation

5        Defendants have provided no contemporaneous record of the facts and analysis supporting

6   the post-September 11 decision to cease issuing temporary documentation.  The only evidence of

7   contemporaneous analysis discussed in the parties' motions is as follows.  First, defendants

8   conducted a "small study internally about the security checks that had been performed in certain

9   cases coming from immigration courts."  SUF ¶ 19.  Second, defendants engaged a contractor to

10  conduct a "larger study about various aspects of security checking, but that study did not particularly

11  relate to cases coming from immigration court."  SUF ¶ 20.  Third, defendants "made multiple

12  attempts to collect information about the results of security checks."  SUF ¶ 21.  Defendants have not

13  provided any of the results of these studies or investigations for review.  Id.

14       Without the ability to examine the studies cited by defendants in order to determine

15  whether they support the post-September 11 policy change, this court is unable to conclude that the

16  policy change had any rational basis.  The fact that defendants now argue, in the context of litigation,

17  that national security concerns justified the change in policy is irrelevant, as a reviewing court must

18  look to the administrative record at the time the change was made.  See National Wildlife Federation,

19  384 F.3d at 1170.  Similarly, citations to the 9/11 Commission report, published in 2004, have no

20  bearing on a rule created over two years earlier.

21       Even if defendants were correct in arguing that a rationale crafted during litigation can be

22  used to justify an earlier rule change, or in the event that defendants choose to issue new regulations,

23  the national security justification as stated does not support a blanket policy of withholding

24  temporary documentation from all EOIR-adjusted LPRs.  First, defendants have not established any

25  actual connection between EOIR-adjusted LPRs and threats to national security.  Defendants are

26  unable or unwilling to identify a single EOIR-adjusted LPR who has been identified as a possible

27  national security threat, much less one who has been detained or deported as a result of security

28

16

1    concerns.  SUF ¶¶ 30, 46.  Moreover, the EOIR has already thoroughly reviewed all of the evidence

2    presented by the alien and by DHS before granting LPR status to each class member.[4]  SUF ¶¶ 4–5.

3          Second, defendants offer no reasonable justification for prolonged delays in the security

4    checking process in the majority of cases, which would provide some reason for withholding

5    temporary documentation.  USCIS currently performs two security checks for each alien who applies

6    for LPR status.[5]  SUF ¶ 24.  The first, an FBI fingerprint check, is generally completed in 48 hours or

7    less, unless the check yields some potentially incriminating information.  SUF ¶ 27.  The second, an

8    "IBIS check," may be performed in less than ten minutes, unless the check yields some potentially

9    incriminating information.  SUF ¶ 28.  Defendants have presented no evidence and made no

10   argument that the particular LPRs awaiting processing are delayed because of information uncovered

11   through the security checks.

12         Third, defendants do not adequately consider alternate mechanisms for addressing national

13   security objectives in the immigration process.  It is imperative that administrative agencies explain

14   possible alternatives and give adequate reasons for rejecting them.  See Motor Vehicle Mfrs. Ass'n,

15   463 U.S. at 48.  The DHS has many options for limiting the freedom of individuals determined to

16   present a threat.  The DHS exercises substantial control over the EOIR proceedings themselves; the

17   DHS may move to reopen decisions to grant LPR status, appeal an immigration judge's decision to

18   the Board of Immigration Appeals, or ask to have the case referred to the Attorney General for final

19   review.  SUF ¶¶ 8–9.  After exhausting any administrative appeals, the DHS may pursue collateral

20   attacks on the administrative decision, such as initiating new removal proceedings or seeking to have

21   the earlier proceedings reconsidered, reopened, or rescinded.  SUF ¶ 11.  Finally, the DHS may

22   detain noncitizens who have been identified as a threat.8 U.S.C. § 1226(a)(3).

23         Defendants argue that the process for rescission, revocation, or termination can be

24   prolonged for several months or years, during which time the LPR may enjoy the benefits of

25   documentation, such as the right to work or travel internationally.  Id.  This argument is flawed for

26   several reasons.  LPRs identified for possible removal are nonetheless entitled to documentation;

27   defendants are required to provide documentation to LPRs during deportation proceedings.  8 C.F.R.

28

1    § 264.5(g); § 1.1(p) (LPR status "terminates upon entry of a final administrative order of exclusion,

2    deportation, or removal").  If the DHS has reasonable grounds to believe that a LPR is engaged in an

3    "activity that endangers the national security of the United States," it may detain the LPR.  8 U.S.C.

4    § 1226a(a)(3).  Defendants object to detaining LPRs who are subsequently determined to be a threat

5    due to the "problem that such an individual would not be subject to detention, and (under Plaintiffs'

6    scheme) would be in possession of LPR documentation, until he or she was actually determined to

7    pose a danger to the United States."  Far from being a "problem," requiring a specific justification

8    before depriving a qualified alien of the rights to work and travel is precisely what is lacking in the

9    blanket deprivation that defendants have established.

10         Fourth, defendants' concern about issuing documentation prior to conducting security

11   checks does not apply to members of the post-April 1, 2005 subclass.  Under the April 1 regulations,

12   the EOIR may not grant LPR status until the required checks are completed and up-to-date.  8 C.F.R.

13   §§ 1003.47(f)–(g), 1003.1.  Any alien adjudicated to be a LPR in the post-April 1 regime is therefore

14   already deemed not to be not a threat as determined by defendants' choice of background checks.[6]

15         Fifth, it is far from clear that defendants' security checks are useful in detecting potential

16   threats to national security.  By defendants' own admission at oral argument, the procedures

17   challenged in this action would not have caught a single September 11 hijacker.  Also, in arguing

18   that the security screening previously performed by the EOIR was inadequate, defendants disparage

19   the EOIR's reliance on the FBI fingerprint check—the very same check USCIS now employs to

20   screen LPRs—as "feckless" because "al Qaeda selected young mujahideen with clean records to

21   avoid raising alerts during travel."  Defs.' Opening Brief at 14; SUF ¶ 108.

22         Sixth, even assuming that defendants' security checks identify potential terrorists, it is

23   unclear on this record that depriving aliens already present in the United States of status

24   documentation furthers national security interests.  As defendants acknowledge, having status

25   documentation is a prerequisite for lawfully obtaining employment.  SUF ¶ 48.  To the extent that

26   plaintiffs constitute a "shadow population, whose affiliations, associates, and indeed very identities

27   were unknown," as defendants allege, forcing plaintiffs to obtain illegal employment delays the point

28

18

1    at which plaintiffs can emerge from those shadows. Also, denying status documentation affects an

2    alien's right to travel only in a very limited way—preventing the alien from reentering the United

3    States following travel abroad. Defendants have articulated no reason why this type of travel, as

4    opposed to the domestic air travel exploited on September 11, 2001, presents a threat to national

5    security.

6         Administrative agencies such as USCIS must explain and justify their actions in order to

7    permit meaningful checks on executive power. "Expert discretion is the lifeblood of the

8    administrative process, but unless we make the requirements for administrative action strict and

9    demanding, expertise, the strength of modern government, can become a monster which rules with

10   no practical limits on its discretion." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 48 (quoting New York

11   v. United States, 342 U.S. 882, 884). It is "obvious and unarguable" that national security is of

12   paramount importance, see Aptheker v. Secretary of State, 378 U.S. 500, 509 (1964), and it is

13   equally obvious that the agencies entrusted with preserving that security should take great pains to

14   make rational use of their limited resources. Defendants' repeated, conclusory appeals to national

15   security concerns do not withstand careful scrutiny and leave this court with no basis for concluding

16   that the post-September 11 policy rationally furthers national security interests. This court concludes

17   that the rule change was "arbitrary and capricious" within the meaning of 5 U.S.C. section

18   706(2)(A).

19

20   **B.    Failure to Issue Permanent Status Documentation**

21        Plaintiffs also contend that defendants have a purely ministerial duty to provide

22   documentation after the EOIR has made a final determination of LPR status, and that defendants may

23   not independently decide to hold up individual files for additional review. Defendants argue that 8

24   U.S.C. section 1304(d) gives USCIS absolute discretion in deciding when to issue documentation,

25   and that there is no requirement for USCIS to provide the documents to LPRs within a reasonable

26   period of time. In the alternative, USCIS argues that regardless of the statutory or regulatory

27   allocation of authority, USCIS has discretion to withhold documentation in order to protect national

28

19

1    security interests.

2

3                    1.       Duty to Issue Documentation

4           This court disagrees with defendants' position that section 1304(d) gives USCIS unfettered

5    discretion as to when it issues documentation of status.  Section 1304(d) provides, in relevant part,

6    that LPRs who have been registered and fingerprinted "shall be issued a certificate of alien

7    registration or an alien registration receipt card in such form and manner and at such time as shall be

8    prescribed under regulations issued by the Attorney General."  It is settled law that USCIS must issue

9    status documentation in response to the EOIR's determination of eligibility and cannot substitute its

10   decision for that of the immigration judge.  Loa-Herrera v. Trominski, 231 F.3d 984, 988 (5th Cir.

11   2000) ("federal law guarantees LPR's certain rights of documentation they can use to prove, to

12   potential employers and others, their right to be in the United States"); Etuk v. Slattery, 936 F.2d

13   1433, 1444 (2d Cir. 1991) ("The INA mandates that the Attorney General provide LPRs who register

14   with proof of their legal status").

15          Defendants rely heavily on the last clause of section 1304(d), which provides that the

16   Attorney General may regulate the "time" and "manner" of issuing documentation, in arguing that

17   USCIS has no duty to provide documentation within a reasonable period of time.  See Loa-Herrera,

18   231 F.3d at 988 (how the right to documentation is protected in practice is within the "express

19   discretion of the Attorney General").  No previous case squarely addresses the Attorney General's

20   discretion with respect to timing.  Both Etuk and Loa-Herrera, however, suggest that any such

21   discretion is limited by the need to preserve the rights guaranteed to LPRs.

22          In Etuk, the Second Circuit held that certain forms of temporary documentation issued by

23   the INS, the predecessor of USCIS, were inadequate to protect the rights guaranteed to LPRs.  Etuk,

24   936 F.2d at 1443.  The temporary documentation in question contained language suggesting that the

25   holder's employment authorization was temporally restricted.  Id. at 1445.  LPRs in possession of the

26   temporary documentation therefore had difficultly obtaining permanent employment.  Id.  The INS

27   argued that it was not required to issue documentation that demonstrated employment authorization.

28

                                                      20

1    Id. at 1444.  The court disagreed, noting that LPRs enjoy "enhanced" rights.  Id. at 1443.  "While we

2    think the Executive still enjoys discretion when dealing with these individuals, we believe that the

3    exercise of that discretion is subject to more intense judicial scrutiny."  Id. at 1443-44.

4              Loa-Herrera is not to the contrary.  The Fifth Circuit in Loa-Herrera, as the court in Etuk,

5    considered the form of documentation that the Attorney General is required to provide.  The court

6    concluded that the Attorney General was bound by existing regulations to issue a particular

7    form—form I-551—and did not consider any limits on the Attorney General's ability to create new

8    regulations that provided for different forms.  Loa-Herrera, 231 F.3d at 989.  In reaching this

9    holding, however, the court cited Etuk for the proposition that the INA "mandates that the Attorney

10   General provide LPRs who register with proof of their legal status."  Id. at 988 n.8.

11             Defendants seek to distinguish Etuk in part based on the time it was decided—in 1991,

12   prior to September 11, 2001—arguing that the concerns raised in Etuk were different and "less

13   portentous" than those that exist today.  To the extent this argument has merit, it relates not to the

14   existence of the duty to provide documentation, which flows from a statutory scheme that is

15   unchanged in relevant part since 1991, but rather to the reasonableness of any deviation from that

16   duty.  The reasonableness of USCIS's withholding documentation is discussed below.

17             The court concludes that USCIS has a duty to provide documentation to LPRs at a time that

18   does not unreasonably compromise the LPRs' enhanced rights.

19

20                             Breach of Duty

21             The facts and arguments surrounding defendants' breach of the duty to issue documentation

22   are distinct for the pre-April 1 subclass and the post-April 1 subclass.  This court will consider each

23   subclass in turn.

24

25                       a.     Pre-April 1 Subclass

26             Plaintiffs and defendants agree that many members of the pre-April 1 subclass continue to

27   await documentation of their status.  Although proof of LPR status for the named plaintiffs was

28

                                              21

1   expedited upon the commencement of this lawsuit, up to 12,539 other LPR class members still

2   awaiting documentation have no such source of special help.  SUF ¶ 65.  These unnamed plaintiffs

3   face the same lack of responsiveness from USCIS, bureaucratic confusion and misplacement of files,

4   and long delays for security checks that once affected the named plaintiffs. SUF ¶ 9.  Given that the

5   named pre-April 1, 2005 plaintiffs waited sixteen months on average from the date of their EOIR

6   order, the delay faced by the rest of the subclass members may stretch into multiple years without

7   court intervention.  See Chen Dec., Exh. I at 163:5-166:10, 169:11-171:2; Exh. D at 3:2-5.

8          Based on the preceding undisputed facts, this court therefore finds that no material dispute

9   exists that defendants are in breach of their duty to provide timely documentation of status with

10  respect to the pre-April 1 subclass.

11

12                    b.    Post-April 1 Subclass

13  _____Defendants argue that plaintiffs have pointed out only one instance of a post-April 1, 2005

14  class member experiencing delays, and thus have not carried their burden of demonstrating the

15  likelihood of future harm for members of the post-April 1 subclass.  Based on the present undisputed

16  record, this court disagrees.[7]  Plaintiffs have presented substantial evidence of bureaucratic delays in

17  the processing of applications which are unrelated to security checks, and defendants acknowledge

18  that the same administrative regime that gave rise to these delays remains in place today.  The new

19  regulations fail to address any objectives or procedures for accountability in LPR documentation, set

20  a time frame for processing proof of status, or target the USCIS, the actor ultimately responsible for

21  issuing LPR documentation.  See generally 70 Fed. Reg. 4743; 8 C.F.R. § 1003; 8 C.F.R. § 1208.

22  With this in mind, the court finds it implausible that a system which was uncoordinated and

23  overwhelmed before the new policy can possibly be rid of all obstructions on April 1, 2005.

24  _____Several factors other than the time required to conduct security checks delayed the issuing

25  of status documentation under the pre-April 1 regime.  For instance, plaintiffs who had already been

26  cleared by security checks before their LPR adjudication still waited up to twenty-two months before

27  receiving proof of their LPR status.  SUF ¶ 34.  Ineffective interagency communication within the

28

DHS also contributed to delayed documentation.  USCIS Deputy Associate Director of Operations Janis Sposato testified that "the first and maybe longest delay" was between the grant of the immigration benefit and USCIS notice of the grant, and that she "wouldn't be surprised" if files were lost, misplaced, or sent to the wrong location.  May 4, 2005 Sposato Dep. at 55:7–10; 59:9–60:2.  Despite acknowledging these gaping holes in the system, defendants represent these "administrative mistakes" as ongoing and offer no proposals for rectifying them.

In contrast, the amount of time required to conduct security checks is small in most cases.  It is undisputed that security checks usually take 48 hours or less unless potential incriminating information is found.  SUF ¶¶ 27–28.  Defendants have presented no evidence and made no argument that the members of the pre-April 1 subclass were delayed as a result of the time required to investigate such information.  Indeed, defendants have not identified a single EOIR-adjusted LPR who is a potential danger to national to security or public safety.  SUF ¶¶ 26, 30.

Moreover, the new policies have created additional reasons for delay.  Newly adjudicated LPRs are not permitted to schedule the first available appointment to initiate documentation if appointments at the USCIS sub-office are fully booked for the two-week window permitted for scheduling.  SUF ¶ 57; May 4, 2005 Sposato Dep. at 66:2–68:18; May 23, 2005 Sposato Dec. ¶ 4 (stating that appointments are available in the "overwhelming majority" of USCIS districts, but noting that some districts continue to experience appointment capacity challenges that the department is struggling to correct).  Thus, an LPR must return to the USCIS office every day until an appointment within the next two week period opens for processing, with no limit to the number of times an individual must return to the office before actually obtaining an appointment.  May 4, 2005 Sposato Dep. at 66:11–19.  USCIS acknowledges that it has no mechanism for tracking the number of times a LPR requests documentation.  SUF ¶ 42.  Based on the currently undisputed evidence of ongoing bureaucratic difficulties, the court concludes that no reasonable dispute exists that there is "some cognizable danger of recurrent violation" with respect to the post-April 1 subclass  W.T. Grant Co., 345 U.S. at 633.

3.      Reasonableness of Delay

Defendants' final argument, vigorously contested by plaintiff, is that national security concerns justify any delay in issuing documentation.  The force of defendants' argument is different in the pre-April 1 and post-April 1 regimes.  The court will therefore consider them separately.

i.      Pre-April 1 Subclass

The Ninth Circuit analyzes the reasonableness of agency delay under the so-called "TRAC factors."  See Independence Mining Co. v. Babbitt, 105 F.3d 502, 507 (9th Cir. 1997).  Under the first two TRAC factors, agencies are permitted a "reasonable" time to carry out their duties.  Id. What is reasonable depends on the statutory context.  Id.

As already discussed, defendants note that 8 U.S.C. section 1304(d) grants the Attorney General authority to create regulations as to the form and timing of documentation that is issued; defendants argue that this language gives the Attorney General broad discretion in withholding evidence of status.  Plaintiffs argue in response that related statutes demonstrate an intent for documentation to be issued quickly.  For example, LPRs are required to carry proof of status with them at all times.  8 U.S.C. § 1304(e); Etuk, 936 F.2d at 1444.  LPRs are not authorized to obtain employment unless they present documentation of status.  SUF ¶ 48.  Moreover, the benefits of LPR status vest in full on the date of the EOIR's order granting status.  8 U.S.C. §§ 1229b(b)(3), 1255(b). The court finds that the statutory importance of documentation and the immediate vesting of rights weigh in favor of prompt issuance that does not unreasonably compromise LPRs' rights.  See Part IV.B.1, supra.

The third and fifth TRAC factors provide that a reviewing court should take into account the nature and extent of the interests prejudiced by delay, and that delays affecting "human health and welfare" are less tolerable than those affecting economic regulation.  Independence Mining Co., 105 F.3d at 509.  Here, where the failure to present documentation precludes lawful employment and obtaining certain state benefits, the effect on the welfare of plaintiffs is obvious and undisputed.[8]

24

UNITED STATES DISTRICT COURT
For the Northern District of California

1       Finally, the fourth and sixth TRAC factors provide that a reviewing court should consider

2  the effect of expediting delayed action on agency activities of a higher or competing priority, but that

3  the agency need not be deliberately or improperly withholding benefits in order for the delay to be

4  unreasonable. Id. at 510.  Defendants' sole justification for the delay in issuing documentation for

5  class members is the need to review each LPR's background to safeguard national security.

6       Defendants cite several cases in support of their argument that national security concerns

7  trump all others in this case.  See Halperin v. Kissinger, 807 F.2d 180, 187 (D.C. Cir. 1986) (stating

8  that "the concept of a special rule for national security matters, such as reduced due process

9  requirements," is "no stranger to court-made law").  See also Haig v. Agee, 453 U.S. 280, 309 (1981)

10 (holding that an individual posing a substantial likelihood of "serious damage" to national security

11 authorizes the government to revoke the citizen's passport); Cole v. Young, 351 U.S. 536, 547

12 (1956) (noting the "obvious justification" for summary suspension power where an employee

13 occupies a "sensitive" position in which he could cause serious damage to national security).

14      Unlike the cases cited in Halperin, there is no individual showing in this case that class

15 members pose a serious risk to national security or that defendants' policies further national security

16 interests.  See Part IV.A, supra.  Absent any such particularized showing, defendants' national

17 security argument cannot excuse the various permutations of bureaucratic errors, administrative

18 backlogs, and inter-agency communication lapses that have caused the delays at issue in this lawsuit.

19 Accordingly, this court finds that defendants' delay in issuing documentation of status to members of

20 the pre-April 1 subclass is unreasonable under section 706(1).

21

22                          ii.    Post-April 1 Subclass

23      The statutory mandate and the harms to plaintiffs are identical with respect to the post-April

24 1 subclass.  As discussed in Part IV.B.2.b, supra, defendants have not yet produced facts

25 demonstrating that delays under the post-April 1 regulations are likely to subsist.

26      Defendants' arguments relating to national security have no force when applied to

27 post-April 1 class members.  Due to defendants' new policy of holding up EOIR adjudication until

28

25

1   all security checks have been completed, defendants have ensured that any class member adjusted

2   after April 1 will already have been deemed not to present a risk to national security, to the extent

3   possible using defendants' chosen security checks.  This court therefore finds that defendants' delay

4   in issuing documentation of status to members of the post-April 1 subclass is also unreasonable

5   under section 706(1).

6

7   V.      Due Process Claims

8           As plaintiffs are entitled to summary judgment on their APA claims, this court will not

9   reach plaintiffs' claims that defendants' failure to issue documentation violates the Due Process

10  Clause of the Fifth Amendment.

11

12  VI.     Remedy

13          "A court, where it finds unlawful agency behavior, may tailor its remedy to the occasion."

14  N.A.A.C.P. v. Secretary of Housing & Urban Dev., 817 F.2d 149, 160 (1st Cir. 1987); see also Ford

15  Motor Co. v. NLRB, 305 U.S. 364, 373 (1939) ("while the court must act within the bounds of the

16  statute and without intruding upon the administrative province, it may adjust its relief to the

17  exigencies of the case in accordance with the equitable principles governing judicial action").

18          Other courts have ordered detailed remedies, including the imposition of concrete

19  deadlines, in response to unlawful agency action or failures to act.  Etuk (upholding an order to issue

20  temporary documentation of status within 21 days of application); Public Citizen Health Research

21  Group v. Brock, 823 F.2d 626, 629 (D.C. Cir. 1987) (ordering OSHA to comply with a timetable for

22  rulemaking and to issue interim progress reports).  It is also settled, however, that "[t]he court should

23  not deny itself the benefit of agency expertise in the absence of extraordinary circumstances."

24  Cal-Almond, Inc. v. Yeutter, 756 F. Supp. 1351, 1356 (E.D. Cal. 1991).

25          Defendants have stated in their briefs and at oral argument that they are taking steps to

26  speed the processing of requests for documentation for the post-April 1 subclass and to complete

27  processing of the existing backlog of pre-April 1 requests.  In order to make these assurances more

28

concrete, the court hereby orders defendants to submit, within 60 days, a proposal for timely issuing evidence of status to both subclasses.  At a minimum, the proposal should include specific strategies for addressing the following points:

(1) The timing for completing security checks for pre-April 1 subclass members.

(2) The process by which pre-April 1 subclass members can request and obtain documentation following completion of the security checks.

(3) An efficient process for collecting biometric data from members of both subclasses. Ideally, for post-April 1subclass members, the collection of biometric data should occur immediately following the grant of LPR status.

(4) The mechanism for ensuring that USCIS obtains prompt notice of the EOIR's determination.

(5) The process by which post-April 1 subclass members can obtain their documentation once it has issued.

CONCLUSION

Based upon the foregoing, defendants' motion to strike is DENIED, plaintiffs' motion for summary judgment is GRANTED, and defendants' motion for summary judgment is DENIED. Plaintiffs are hereby ordered to submit to this court and to defendants within 30 days the names and contact information of named plaintiffs for the post-April 1 subclass. Defendants are hereby ordered to submit to this court within 60 days a proposal for timely issuing evidence of status to members of both subclasses, as outlined above. Defendants are also permitted to submit to this court within 30 days additional affidavits in support of their motion under Rule 56(f).

IT IS SO ORDERED.

Dated: August 24, 2005

Marilyn Hall Patel
United States District Court Judge
Northern District of California

28

ENDNOTES

1. The present class action concerns only those aliens who are removable from the United States and placed in immigration proceedings with the constituent courts of the EOIR.  Class members have been granted permanent residency as relief from removal, often referred to as a "defensive" adjustment of status.  See Aug. 9, 2004 Sposato Dec. ¶ 2.  The class does not encompass those persons who apply for "affirmative" adjustment of status based on a direct application to the USCIS for an immigration benefit.  See id. ¶ 1.

2. The USCIS is a division of the Department of Homeland Security (referred to herein as "DHS") which is responsible for administering immigration laws.

3. One of the nineteen pre-April 1 affiants received adjudication on April 1, 2005, but was processed under the pre-April 1 regime.

4. It is also apparently undisputed that the EOIR performed the FBI fingerprint check, one of the two security checks currently performed by USCIS, even prior to the April 1, 2005 change in regulations.  See Defs.' Opening Brief at 14.

5. At oral argument, defendants acknowledged that they perform a third, time-consuming FBI name check in some cases.  Defendants represented, however, that they do not delay issuing documentation pending completion of this check.

6. It is true that the background checks may expire between the EOIR adjudication and the time at which USCIS issues documentation of status.  SUF ¶ 29.  USCIS is no doubt capable of crafting a fair procedure for handling such a case.

7. As discussed in Part III, supra, defendants may present by further affidavits facts creating such a dispute, as well as reasons that such facts are currently unavailable.

8. Defendants assert that plaintiffs' interests are not compromised because certain class members have managed to remain employed despite lacking documentation of their LPR status.  LPRs, however, are entitled to work lawfully.  8 U.S.C. §§ 1324a(h)(3), 1324a(a)(1)(A).  Defendants do not dispute that employers who hire individuals without documentation risk civil and criminal penalties.  SUF ¶ 48.